IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHREN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| JAMES ROBINSON, III and CHRIS | § | |
| SCRUGGS, individually and | § | |
| on behalf of those similarly situated, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Civil Action No. 4:15-cv-158-Y |
| v. | § | |
| | § | |
| GENERAL MOTORS COMPANY | § | |
| and GENERAL MOTORS, LLC, | § | |
| | § | |
| Defendants. | § | |

---

**RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR RULE 23(b)(2) OR
23(b)(1) CLASS CERTIFICATION AND BRIEF IN SUPPORT**

---

John B. Brown
Texas State Bar No. 00793412
john.brown@ogletreedeakins.com
Gavin S. Martinson
Texas State Bar No. 24060231
gavin.martinson@ogletreedeakins.com

**OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.**
8117 Preston Road, Suite 500
Dallas, Texas  75225
Telephone:  214.987.3800
Facsimile:  214.987.3987

**ATTORNEYS FOR DEFENDANTS**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................................................. 1

II. FACTUAL BACKGROUND .............................................................................. 2

    A.    Overview of General Motors and the Arlington Assembly Plant .......................... 2

    B.    Employees at the Arlington plant receive generous leave for vacations and holidays. .................................................................................................... 3

    C.    Employees' leave requests impact the Arlington plant's overtime requirements ... 5

    D.    GM provides religious accommodations to several Arlington employees, including Plaintiff.………. .................................................................................. 7

    E.    Robinson is a full-time union committeeperson, which requires GM to evaluate his leave requests differently than other electricians' requests ............................. 7

III. ARGUMENT AND AUTHORITIES ............................................................... 8

    A.    Plaintiffs must meet a high burden to certify a class. ........................................... 8

    B.    The Court should deny Plaintiffs' certification request because the purported class members are not clearly ascertainable. ................................................................. 9

    C.    Plaintiffs have failed to satisfy the certification requirements of Rule 23(a). ...... 11

            1.    Plaintiffs have failed to sufficiently prove numerosity because they rely solely on unsupported speculation to guess the size of the class. ............. 11

            2.    Plaintiffs have failed to identify common questions of law or fact to support a class action because the merits of each class member's claims will necessarily require individual, circumstance-specific inquiries. ....... 12

            3.    Plaintiffs have failed to demonstrate that their claims are typical of the class claims because the Arlington plant's overtime plan is different from the overtime plans of all other GM plants, Plaintiffs already receive religious accommodations, and Robinson works in a unique full-time role as union committeeperson .......................................................................... 19

    D.    Plaintiffs have failed to meet the certification requirements of Rule 23(b)(1) or (b)(2). .................................................................................................................. 21

IV. CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Abrams v. Kelsey-Seybold Med. Grp., Inc.*, 178 F.R.D. 116 (S.D. Tex. 1997) .......................11, 12

*Bozes v. Parish of St. Bernard*, 252 F.R.D. 313 (E.D. La. 2008) ..................................11

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ...................................................8

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ..........................................8

*DeBremaecker v. Short*, 433 F.2d 733 (5th Cir. 1970) ......................................9

*EEOC v Firestone Fibers & Textiles Co.*, 515 F.3d 307 (4th Cir. 2008) ...................18, 20, 24, 25

*Fleming v. Travenol Labs., Inc.,* 707 F.2d 829 (5th Cir.1983) ...................................11

*Frey v. First Nat. Bank Sw.*, 602 F. App'x 164 (5th Cir. 2015) ..................................10

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982) .......................................9

*Haliye v. Celestica Corp.*, No. 06-CV-4769, 2009 WL 1653528
(D. Minn. June 10, 2009) ......................................................... passim

*In re Monumental Life Ins. Co.*, 365 F.3d 408 (5th Cir. 2004)..................................10

*Jenkins v. State of La., Through Dep't of Corr.*, 874 F.2d 992 (5th Cir. 1989) ...........................14

*John v. Nat'l Sec. Fire & Cas. Co.,* 501 F.3d 443 (5th Cir. 2007) ..................................9

*Pederson v. Louisiana State Univ.*, 213 F.3d 858 (5th Cir. 2000)..................................11

*Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.*, 485 F.3d 804
(5th Cir. 2007)..................................................................10

*Redmond v. GAF Corp.*, 574 F.2d 897 (7th Cir. 1978)........................................14, 22

*Riley v. Compucom Systems, Inc.*, No. CIV.A398CV1876L, 2000 WL 343189
(N.D. Tex. Mar. 31, 2000) .........................................................19

*Smith v. Pyro Min. Co.*, 827 F.2d 1081 (6th Cir. 1987)........................................13

*Turpen v. Ms.-Ks.-Tex. R. Co.*, 736 F.2d 1022 (5th Cir. 1984) .............................13, 14

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ..............................8, 12, 18, 19

*Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030 (5th Cir.1981) ..........................11

**FEDERAL RULES**

Fed. R. Civ. P. 23(a)(3)...................................................................................................19, 21

Rule 23 ...............................................................................................................................1, 8, 9

Rule 23(a)....................................................................................................................... passim

Rule 23(b) ...................................................................................................................... passim

**OTHER AUTHORITIES**

Manual for Complex Litigation (Fourth) § 21.222 (2004) ............................................10

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHREN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| JAMES ROBINSON, III and CHRIS SCRUGGS, individually and on behalf of those similarly situated, | § § § § | |
| Plaintiffs, | § § | Civil Action No. 4:15-cv-158-Y |
| v. | § § | |
| GENERAL MOTORS COMPANY and GENERAL MOTORS, LLC, | § § § | |
| Defendants. | § § | |

### DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR RULE 23(b)(2) OR 23(b)(1) CLASS CERTIFICATION AND BRIEF IN SUPPORT

## I.
## INTRODUCTION

Even though Plaintiffs James Robinson, III and Chris Scruggs—both current General Motors employees—will receive four weeks of vacation, seventeen additional holidays in 2015, and *every single Saturday* off as a religious accommodation, they claim that GM has discriminated against them based on their religious beliefs because GM has not agreed to provide Plaintiffs an additional twenty-plus unpaid days off for religious holy days.  Furthermore, Plaintiffs seek to certify a class of "all General Motors workers within the United States subject to the UAW-GM National Agreement and who may seek unpaid leave for a holy day because of a religious belief."  (Mot. at 2.)  But this class definition is legally inadequate, and Plaintiffs lack the evidence needed to satisfy the high burden required for Rule 23 class certification.  Instead of identifying the need for class-wide relief, Plaintiffs' Motion for Class Certification and the supporting evidence merely illustrate the individualized nature of their own religious-accommodation requests and the lack of similarly situated class members.  Plaintiffs support

their Motion by citing exactly four cases—none of which involve the certification of a class based on failure to accommodate religious beliefs.  This is unsurprising since religious-accommodation requests are inherently individual-fact specific and thus particularly ill-suited for class relief.  Indeed, GM has not found a ***single case*** in which a federal court has certified a class based on an employer's alleged failure to accommodate religious leave under Title VII. Plaintiffs' bare-bones Motion falls far short of establishing the need for class relief, and the Court should thus deny it.

**II.**
**FACTUAL BACKGROUND**

**A.      Overview of General Motors and the Arlington Assembly Plant**

GM employs approximately 51,000 employees at sixty-nine facilities who are subject to the current collective-bargaining agreement between the union and GM, known as the 2011 UAW-GM National Agreement ("National Agreement").  (Brian Kole Decl., attached, App. 4.) The National Agreement governs labor relations with a wide variety of employees holding several different jobs, including other-than-skilled general production employees and skilled-trades employees like electricians, millwrights, pipefitters, toolmakers, and die makers.  (*Id*.)

GM's Arlington Assembly Plant in Arlington, Texas—the plant at which Plaintiffs work—is a 250-acre facility that has been producing automobiles for over sixty years.  *See* http://arlington.gmplantnews.com/Facilities/public/us/en/arlington/about_us.htmlplant          (last visited on June 17, 2015).  Currently, the Arlington plant is the only facility that produces GMC Yukons and Yukon XLs, Chevrolet Suburbans and Tahoes, and Cadillac Escalades and Escalade ESVs.  It produces about 1200 of these vehicles every day.  *Id.*  The plant employs approximately 3600 other-than-skilled production workers and approximately 275 skilled-trades employees, including approximately 133 electricians.  (Kole Decl., App. 4.)

The Arlington plant is divided into four main areas (stamping, body shop, paint, and general assembly) and runs twenty-four hours per day.  (Kole Decl., App. 4.)  With the recent increased customer demand for the vehicles produced at the Arlington plant, production currently runs from Sunday at 10:00 p.m. through Sunday at 12:30 a.m. on most weeks.  (Kole Decl., App. 4.)  The work day is divided into three shifts, and electricians have been scheduled to work every shift of every day, including weekends, for the past five years (with very few exceptions).  (Kole Decl., App. 4, 7.)  Electricians must meet the requirements outlined in the National Agreement, which sets forth a four-year apprenticeship program to learn the requirements for the job at the Arlington plant, or else demonstrate eight years of relevant experience.  (Kole Decl., App. 7, 31-35.)  Electricians have several job responsibilities, including repairing and maintaining the approximately 1000 robots in the plant.  (Kole Decl., App. 7.)

### B.     Employees at the Arlington plant receive generous leave for vacations and holidays.

Vacation time is determined by seniority under the National Agreement.  James Robinson and Chris Scruggs are entitled to four weeks of vacation per year.  Five weeks of paid vacation per year is the maximum permitted under the National Agreement.  (Kole Decl., App. 5, 36.)

The National Agreement and local agreements between GM and the union at Arlington set forth the required process for requesting vacation.  (Kole Decl., App. 6, 40-42, 82-83.)  Each February, employees are entitled to submit vacation requests of three or more days in the same calendar week for the upcoming year.  (*Id*.)  GM considers and responds to those requests by March 15.  (*Id*.)  Several factors determine whether GM will grant a particular vacation request, including seniority, production schedules, and the volume of vacation requests for a particular time period.  (*Id*.)

After February, vacation requests are considered on a first-come, first-serve basis.  (Kole Decl., App. 6, 82.)  Per local agreement with the union, a maximum of 12% of skilled-trades employees and 7% of other-than-skilled employees at the Arlington plant can schedule vacation on a single day.  (Kole Decl., App. 5.)  Furthermore, when a skilled-trades employee takes a vacation day on Monday or Friday, he or she automatically gets the adjacent weekend days off without pay and without using any vacation hours under local agreement with the union.  (Kole Decl., App. 5, 84-85.)  Other-than-skilled employees who take vacation on Friday also get the adjacent weekend off without using vacation hours.  (Kole Decl., App. 5.)  GM considers all of these factors when evaluating a particular vacation or leave request.

After ninety days of employment, permanent GM employees have the option of using five of their vacation days as "vacation restricted" days.  (Kole Decl., App. 6.)  Unlike with ordinary vacation days, "vacation restricted" days do not require pre-approval. (*Id*.)  Employees can utilize "vacation restricted" days by simply calling a hotline at least thirty minutes before their shift starts.  (*Id*.)  But the National Agreement lists certain blackout dates on which employees cannot use "vacation restricted" time, including the next scheduled work day in the week following a Friday holiday.  (Kole Decl., App. 6, 38, 58-61.)

Under the National Agreement, an employee can schedule and take allotted vacation time off work but defer receiving the compensation until January of the following year.  (Kole Decl., App. 6, 38, 42.)

In addition to GM's employee-friendly vacation policy, the National Agreement also ensures that employees receive fourteen to seventeen paid holidays per year.  (Kole Decl., App. 5, 44-46.)  And an employee who volunteers and is scheduled to work on a company holiday earns double pay plus the holiday pay, which effectively means that employees have the option

of working on holidays for triple pay.  (Kole Decl., App. 5.)  Furthermore, an employee who volunteers to work a company holiday can also elect to waive the holiday pay and take an extra paid vacation day during the current year, and employees who work over the Christmas-holiday period can take their extra vacation days the following year.  (*Id.*)

### C.     Employees' leave requests impact the Arlington plant's overtime requirements.

When employees on a given shift are on vacation, leave, or not at work for any other reason, GM usually fills the open slots for that shift with "absentee replacements" assigned to the given shift.  (Kole Decl., App. 6-7.)  There are typically two absentee replacements assigned to each shift for electricians in the body shop.  (*Id.*)  When absences exceed the number of absentee replacements, GM usually fills the vacancies with employees who work overtime hours.  (*Id.*) Per the National Agreement and local agreements with the union in Arlington, GM first fills the open slots with employees of the requisite skill set who have volunteered to work overtime for the given shift.  (Kole Decl., App. 7, 29-30, 73-81.)  If there are insufficient volunteers, GM "forces" employees to fill the vacancies and work overtime per the National Agreement and local agreement with the union.  (Kole Decl., App. 7.)

GM decides which employees it will "force" to work overtime based on several factors, including the numbers of overtime hours previously worked by the other employees in the department.  (Kole Decl., App. 7.)  Pursuant to local understanding between GM and the union, GM cannot require skilled-trades employees at the Arlington plant to work more than eleven hours in a single day.  (Kole Decl., App. 4.)  Under the National Agreement, a skilled-trades employee who has worked thirteen consecutive days is entitled to receive the following Sunday off.  (Kole Decl., App. 5, 66-68.)

The greatest need for overtime volunteers among electricians and other skilled-trades positions at the Arlington plant occurs on the weekends. (Kole Decl., App. 7.) GM has the need for overtime workers at the Arlington plant virtually every weekend, and GM regularly "forces" electricians and other skilled-trades employees to work overtime on weekends because it does not receive a sufficient number of volunteers to cover the required weekend shifts. (Kole Decl., App. 7.) This issue has recently become particularly prominent with the increased production schedule needed to meet the high demand for vehicles produced by the Arlington plant. The local union representatives in Arlington—including Robinson—have recently complained about the number of employees "forced" to work overtime on the weekends. (Kole Decl., App. 7.)

The overtime plan utilized at Arlington is unique from the overtime plans utilized at any other GM plant. (Kole Decl., App. 4.) The National Agreement provides that a local union can vote to adopt an overtime plan listed in the National Agreement, but the local union at the Arlington plant has not voted to adopt those overtime plans. (Kole Decl., App. 4, 47-57.) Instead, overtime policy at the Arlington plant is governed by local understanding between the union and management at the plant. (Kole Decl., App. 4.)

For each weekend shift at the Arlington plant, GM tracks skilled-trades employee schedules and plant staffing needs on a chart known as the Paragraph 71 Equalization of Overtime Hours Chart, which helps GM manage weekend overtime. (Kole Decl., App. 8, 86-91.) The chart notes which employees are on leave (religious or otherwise) and vacation, as well as the plant's staffing needs for that particular weekend shift. (*Id*.) With that information, GM determines how many overtime workers it will need per shift in each department. (*Id*.) GM then fills those overtime slots with absentee replacements and then other employees who had previously volunteered to work overtime on the day(s) in question. (Kole Decl., App. 6-7, 29,

73-81.)   But if there are insufficient volunteers to meet the staffing requirements for a particular shift, GM must "force" employees to work overtime.   (*Id.*)   Thus, when employees are out on leave, their absence regularly results in GM paying increased overtime wages and causes GM to "force" available employees—especially in the skilled trades—to work weekend overtime shifts.

### D.   GM provides religious accommodations to several Arlington employees, including Plaintiffs.

GM's policy is to provide religious accommodations to its employees that do not create an undue hardship on the company.   (Kole Decl., App. 8.)   GM does not have a policy prohibiting leave for religious holidays.   (*Id.*)   Indeed, in the Arlington plant, GM currently provides religious accommodations in the form of excused days off work for approximately twenty-five employees, including Plaintiffs.   (Kole Decl., App. 8.)   Even though Saturdays are regular work days for electricians in Arlington, Plaintiffs are allowed off every Saturday as a religious accommodation.   (Kole Decl., App. 8; App. to Mot. at 2, 8.)   Janelle Fox, whose declaration Plaintiffs submitted, also receives all Saturdays off as a religious accommodation. (Kole Decl., App. 8.)   In addition, GM allows several employees to take Sundays off as a religious accommodation, and GM has also granted employees' requests to leave their shifts for a few hours to attend religious worship services.   (Kole Decl., App. 8.)

### E.   Robinson is a full-time union committeeperson, which requires GM to evaluate his leave requests differently than other electricians' requests.

Robinson was recently elected as a full-time union committeeperson, and thus he currently functions in that role and not as a practicing electrician at the Arlington plant.   (Kole Decl., App. 8, 92.)   Because Robinson is a full-time union representative, his requests for vacation or leave are evaluated differently than similar requests from functioning electricians. (Kole Decl., App. 8.)   When Robinson is absent, the alternate committeeperson fills Robinson's full-time union role.   (*Id.*)   Because the alternate does not regularly fill a full-time role with the

union, the alternate maintains his or her usual job at the plant and only leaves the floor to fill in for Robinson.  (*Id.*)    Accordingly, when Robinson is absent from work, the alternate fills Robinson's role, which leaves a production-job vacancy that GM must backfill with another qualified employee; this generally results in overtime hours for the alternate's replacement.  (*Id.*)

## III.
## ARGUMENT AND AUTHORITIES

Plaintiffs seek to certify a class of GM employees who hypothetically "may" seek unpaid religious leave "now or in the future."  (Mot. at 11.)    Because this class is not clearly ascertainable, Plaintiffs have failed to meet the threshold requirement for obtaining class certification.  Furthermore, the individualized inquiries required to determine whether GM failed to accommodate religious beliefs illustrate that Plaintiffs' claims cannot support a class action as a matter of law.

### A.      Plaintiffs must meet a high burden to certify a class.

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979).  To come within the exception, a party seeking to maintain a class action "must affirmatively demonstrate his compliance" with Federal Rule of Civil Procedure 23.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551-52 (2011).  Rule 23 "does not set forth a mere pleading standard."  *Id.*  Plaintiffs must "be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)."  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).  Then, Plaintiffs "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)."  *Id.*  This is not a low threshold; class certification is only

warranted if, after a "rigorous analysis," Plaintiffs' Motion demonstrates that class relief is necessary in this case. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982).

Under Rule 23(a), class certification is appropriate only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. If Plaintiffs meet these Rule 23(a) requirements, they then must satisfy the Rule 23(b)(1) or (b)(2) certification requirements.[1] Rule 23(b)(1) requires Plaintiffs to identify how prosecuting separate actions against individual class members would create a risk of inconsistent adjudications or that such adjudications would substantially impair or impede non-parties' ability to protect their interests, and Rule 23(b)(2) requires Plaintiffs to show that GM has acted or refused to act on grounds that apply generally to the class as a whole. Plaintiffs have failed to meet the requirements for certifying a class action under Rule 23(a) or Rule 23(b), and thus the Court should deny Plaintiffs' Motion.

> **B.    The Court should deny Plaintiffs' certification request because the purported class members are not clearly ascertainable.**

As a threshold matter, the Court should deny Plaintiffs' Motion because the purported class is not clearly ascertainable. "It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970). "The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23." *John v. Nat'l Sec. Fire & Cas. Co.,* 501 F.3d 443, 445 (5th Cir. 2007). Thus, the Fifth Circuit has warned that plaintiffs "should take care in defining

---

[1] "Plaintiffs do not seek certification under Rule 23(b)(3)." (Mot. at 12.)

the putative class." *Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc*., 485 F.3d 804, 821 (5th

Cir. 2007). "A precise class definition is necessary to identify properly those entitled to relief,

those bound by the judgment, and those entitled to notice." *In re Monumental Life Ins. Co*., 365

F.3d 408, 413 (5th Cir. 2004) (quotation marks and citation omitted). The Manual for Complex

Litigation explains:

> Although the identity of individual class members need not be
> ascertained before class certification, the membership of the class
> must be ascertainable . . . .   An identifiable class exists if its
> members can be ascertained by reference to objective criteria. The
> order defining the class should avoid . . . terms that depend on
> resolution of the merits (e.g., persons who were discriminated
> against).

Manual for Complex Litigation (Fourth) § 21.222 (2004).

Plaintiffs have not asserted a clearly defined and ascertainable class. Instead, Plaintiffs

seek to represent a class of "all General Motors workers within the United States subject to the

2011 UAW-GM National Agreement and who ***may*** seek unpaid leave for a holy day because of a

religious belief." (Mot. at 2 (emphasis added).) Membership in this purported class is not based

on objective criteria, but rather a hypothetical—*i.e.* the possibility that GM employees "may"

seek unpaid religious leave. Plaintiffs' class definition is thus not "clear and definite." *Frey v.

First Nat. Bank Sw.*, 602 F. App'x 164, 168 (5th Cir. 2015)[2]. In *Frey*, the class was only

sufficiently ascertainable because it constituted "*identifiable* individuals charged a recorded fee

after using one specified ATM between two specified dates." *Id.* (emphasis added). Because

there would be no "lengthy individualized analysis of each account and all of its individual

transactions" to identify class members, the court affirmed the district court's ruling that the

class was ascertainable. *Id.* at 169. Plaintiffs' purported class is the exact opposite. The Court

cannot identify individual members of the requested class because it includes ***any*** GM employee

---

[2] Copies of all cited unpublished cases are included in the Appendix, filed concurrently with this Response.

who *might* request unpaid religious leave in the future.  And the Court would have to wade through voluminous leave requests and evaluate each individual circumstance (*e.g.,* whether the request was based on religion, whether the employee requested *unpaid* leave, whether volunteer replacements were available, etc.) to determine whether any particular GM employee qualifies as a member of Plaintiffs' class.  Such a class is not adequately defined or ascertainable, and thus the Court should deny Plaintiffs' Motion on this basis alone.

### C.   Plaintiffs have failed to satisfy the certification requirements of Rule 23(a).

#### 1.   Plaintiffs have failed to sufficiently prove numerosity because they rely solely on unsupported speculation to guess the size of the class.

Rule 23(a)(1) requires Plaintiffs to show that "the class is so numerous that joinder of all members is impracticable."  "Speculation that a class is numerous is insufficient to prove numerosity." *Abrams v. Kelsey-Seybold Med. Grp., Inc.*, 178 F.R.D. 116, 128 (S.D. Tex. 1997) (citing *Fleming v. Travenol Labs., Inc.,* 707 F.2d 829, 833 (5th Cir.1983)).  Plaintiffs must present "some evidence or reasonable estimate of the number of purported class members." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir.1981).  "A plaintiff cannot rely on conclusory allegations that joinder is impracticable" to satisfy the numerosity requirement. *Bozes v. Parish of St. Bernard*, 252 F.R.D. 313, 316 (E.D. La. 2008) (internal quotation omitted).  A "mere allegation that the class is too numerous to make joinder practicable," is, without supporting evidence, legally insufficient to support class certification." *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000) (internal quotation omitted).  Plaintiffs fail to satisfy Rule 23(a)'s numerosity requirement.

To support their numerosity argument, Plaintiffs simply state that there are 396 GM plants and then proclaim—without any evidence whatsoever—that the Court should estimate that four employees from each plant fit within the desired class. (Mot. at 10.)  Then—again without

any supporting evidence—Plaintiffs summarily "estimate" that the actual number of qualifying employees is "five to ten times this number," resulting in a class of between "7,920 and 15,840" GM employees.  (Mot. at 10.)  Because Plaintiffs "have failed to introduce any evidence of numerosity, and have only speculated that numerosity has been met," their allegations are legally inadequate.  *Abrams*, 178 F.R.D. at 128.  Plaintiffs' class-size guess is no more than sheer speculation, and thus the Court should deny their Motion for Class Certification.

> **2.    Plaintiffs have failed to identify common questions of law or fact to support a class action because the merits of each class member's claims will necessarily require individual, circumstance-specific inquiries.**

The Court should likewise deny Plaintiffs' Motion because there are no common questions of law or fact sufficient to maintain a class under Rule 23(a).  In *Dukes*, the Supreme Court clarified the types of "common" questions that are sufficient to satisfy Rule 23(a)(2)'s commonality requirement.  As the *Dukes* court observed, the language of Rule 23(a)(2) is "easy to misread, since '[a]ny competently crafted class complaint literally raises common questions.'" 131 S. Ct. at 2551.  "[T]he mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once."  131 S. Ct. at 2551.  Rather, Plaintiffs bear the significant burden of articulating a common question "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*

The *Haliye v. Celestica Corp.* case is particularly instructive.  *See Haliye v. Celestica Corp.*, No. 06-CV-4769, 2009 WL 1653528 (D. Minn. June 10, 2009).  In that case, the plaintiffs sought class-wide religious accommodations under Title VII on behalf of "past, present, and future Muslim employees of Celestica . . . who want to pray according to the Muslim prayer

schedule." *Id.* at *5.  The court denied the plaintiffs' motion for class certification, explaining that "the outcome of a Title VII religious-accommodation claim is highly dependent on the specific facts of the claim." *Id.* at *8.  Applying the same legal standard as the Fifth Circuit, the court noted that the plaintiffs would have to establish a prima facie case of the employer's failure to accommodate, which "requires an individualized inquiry into whether the plaintiff has a bona fide religious belief, whether the plaintiff informed her employer of her belief, and whether the plaintiff suffered discipline as a result of her failure to comply with a conflicting employment requirement." *Id.*; *see also Turpen v. Ms.-Ks.-Tex. R. Co.*, 736 F.2d 1022, 1026 (5th Cir. 1984). The court would then have to "determine whether a proposed accommodation was reasonable or would have imposed an undue hardship," which would require evaluations of "such individualized factors as the nature of the plaintiff's job duties, the nature and strength of the plaintiff's religious beliefs, the nature of the employer's efforts to accommodate her beliefs, and the plaintiff's reaction to the employer's accommodation efforts." *Haliye*, 2009 WL 1653528, at *8.  The court held that "[n]one of these issues can be resolved on a classwide basis" because "[e]ach plaintiff's case presents a unique combination of factors that bear on the issues of reasonable accommodation and undue hardship." *Id.*; *see also Smith v. Pyro Min. Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987) ("The reasonableness of an employer's attempt at accommodation cannot be determined in a vacuum.  Instead, it must be determined on a case-by-case basis; what may be a reasonable accommodation for one employee may not be reasonable for another.").

Plaintiffs' Motion illustrates that Plaintiffs—like the plaintiffs in *Haliye*—have failed to sufficiently demonstrate commonality.  They summarily argue that "virtually every material issue of law and fact is common to the class," but the record evidence and common sense prove otherwise.  (Mot. at 11.)  Because Plaintiffs' desired class includes all GM employees subject to

the National Agreement who may ever seek unpaid religious leave, the necessary individualized inquiries are virtually endless.  The Court will have to engage in myriad individual-fact specific analyses unique to each class member just to determine whether each class member can establish a prima facie case of religious discrimination.  For each putative class member, the Court will need to first evaluate whether "he or she has a bona fide religious belief that conflicts with an employment requirement."  *Turpen*, 736 F.2d at 1026.  That will require an evaluation of each plaintiff's religious beliefs, the specific leave they are requesting, and the availability of vacation or other leave to the individual employee.  And because the putative class covers the entire country, these inquiries would take place across dozens of GM plants—each with its own unique production schedule and staffing requirements for each particular job on each particular shift.  Following those onerous individualized investigations, the Court would then need to determine whether each putative class member notified GM of his or her accommodation request and whether he or she suffered any discipline as a result—all of this just to evaluate whether the class can clear the prima-facie hurdle.  *Id.*; *see also Jenkins v. State of La., Through Dep't of Corr.*, 874 F.2d 992, 995-96 (5th Cir. 1989).

Even assuming the Court could somehow determine whether each class member established the prima facie requirements for a religious discrimination claim, it would next need to delve into the inherently individualized evaluations of reasonable accommodations and undue hardship, which are governed by "the unique circumstances of the individual employer-employee relationship."  *Redmond v. GAF Corp.*, 574 F.2d 897, 902 (7th Cir. 1978).  Whether GM properly accommodated each leave request will turn on a comparison of each employee's requested leave and the schedule and staffing needs for that employee's particular job during the relevant shift in the specific plant in which the employee works.  The putative class members

involve *all* GM employees subject to the National Agreement, which covers a wide range of skilled and other-than-skilled trades positions.  (Kole Decl., App. 4.)  For each request, the Court will need to evaluate whether replacement workers are available, whether GM would have to pay those replacement workers overtime wages, and whether GM can properly utilize the replacements within the restrictions of the National Agreement and local agreements with the union.  "None of these issues can be resolved on a classwide basis."  *Haliye*, 2009 WL 1653528, at *8.

The record evidence based on the Arlington plant alone illustrates that the religious-accommodation claims at issue in this case require unique case-by-case inquiries rather than common resolutions applicable to all members of Plaintiffs' far-reaching putative class.  The Arlington plant employs approximately 3600 production workers, including about 275 skilled-trades employees, roughly 133 of whom are electricians.  (Kole Decl., App. 4.)  The plant runs twenty-four hours per day, with production currently generally running six days per week to meet the high customer demand for the vehicles produced there.  (Kole Decl., App. 4.)  The work day is divided into three shifts.  (*Id*.)

When an employee requests leave beyond the five to six weeks of vacation time and other company holidays to which they are entitled, several factors impact whether GM can accommodate the particular request at the Arlington plant.  (Kole Decl., App. 5, 36, 44-46.)  First, GM must evaluate the staffing requirements and replacement availability for each shift for which the employee requests leave.  That evaluation requires GM to determine how many employees will already miss the particular shift for vacation, leave, or any other reason—including those to whom GM has already granted religious leave.  GM fills these vacancies with the "absentee replacement" employees assigned to cover the shift, and then GM fills additional

vacancies with employees who have volunteered to work overtime for that shift. (Kole Decl., App. 6-7.) If there are still additional vacancies on the shift following that process—which occurs regularly for skilled-trades employees, especially on the weekends—GM must "force" employees to work overtime hours to fill in for those on vacation or leave, according to the terms of the National Agreement. (*Id.*) For the past five years, GM has needed electricians to work virtually every shift for every day, including weekends. (Kole Decl., App. 7.)

For each leave request, GM must analyze which employees are available to work the given shift, which are out on vacation or leave (including religious leave), and then determine which employees will work overtime hours to fill in. Furthermore, GM must consider whether the employee is an other-than-skilled general production worker or a skilled-trades employee because different policies apply to each. For example, in determining who can work overtime to fill in for a skilled-trades employee like an electrician, GM must ensure that it does not require the replacement to work more than eleven hours in a day, or thirteen days in a row if the employee is scheduled to work the following Sunday. (Kole Decl., App. 4-5, 66-68.) In finding weekend skilled-trades replacements, GM must also consider whether the potential replacement employees are taking vacation on the Friday or Monday adjacent to the weekend because those employees are entitled to also take vacation on the weekend day for which GM needs to find the overtime replacement. (Kole Decl., App. 5, 84-85.) GM must weigh all of these factors on a case-by-case basis to determine whether and how it can accommodate religious-leave requests.

For skilled-trades employees, GM tracks information regarding employee absences, staffing needs, and "forced" overtime workers using a spreadsheet called a Paragraph 71 Equalization of Overtime Hours Chart. (Kole Decl., App. 8, 86-91.) This chart provides a visual example of the individualized assessments required when determining whether to accommodate

leave.  For example, on May 2-3, 2015—days that Robinson identified as holy days (App. to

Mot. at 5)—the Paragraph 71 Equalization of Overtime Hours Chart shows several employees,

including electricians, were "forced" to work overtime to fill in for absent employees, several of

whom were out for religious leave:

| | 1st Shift (5/2) | 1st Shift (5/3) | 2nd Shift (5/2) | 2nd Shift (5/3) | 3rd Shift (5/2) | 3rd Shift (5/3) |
|---|---|---|---|---|---|---|
| **ELECTRICIANS** needed for shift | 27 | 30 | 14 | 17 | 17 | 18 |
| Vacation/Leave/Etc. (# on religious leave) | 15 (1) | 12 (1) | 23 (2) | 22 (1) | 22 (1) | 20 (0) |
| Forced Overtime | 4 | 4 | 6 | 8 | 0 | 0 |
| **MILLWRIGHTS** needed for shift | 11 | 8 | 11 | 9 | 9 | 8 |
| Vacation/Leave/Etc. (# on religious leave) | 1 (0) | 4 (3) | 1 (0) | 4 (0) | 4 (0) | 5 (0) |
| Forced Overtime | 6 | 5 | 2 | 1 | 0 | 0 |
| **PIPEFITTERS** needed for shift | 8 | 6 | 6 | 7 | 5 | 6 |
| Vacation/Leave/Etc. (# on religious leave) | 7 (0) | 9 (5) | 4 (0) | 3 (0) | 5 (0) | 4 (0) |
| Forced Overtime | 1 | 1 | 0 | 0 | 3 | 2 |
| **TOOLMAKERS** needed for shift | 3 | 5 | 3 | 2 | 5 | 6 |
| Vacation/Leave/Etc. (# on religious leave) | 5 (0) | 3 (0) | 7 (0) | 8 (0) | 3 (0) | 2 (0) |
| Forced Overtime | 0 | 0 | 1 | 0 | 0 | 0 |

(*See* Kole Decl., App. 8, 86-91.)  At the Arlington plant, for each leave request GM must

consider how many employees in each department are out on a given shift (including for

religious leave), how many volunteer replacements are available, and how many employees

would be "forced" to work overtime under the unique locally-agreed Arlington overtime plan,

and how that might impact the workforce.  And GM must conduct similar case-specific inquiries

for each request in its plants across the country—evaluating the specific overtime plan that

applies to that particular plant.  Such case-specific analyses illustrate that class relief is

demonstrably inappropriate.

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION     Page 17**

Indeed, Plaintiffs' own particular allegations demonstrate that these claims are ill-suited for a one-size-fits-all class action.  Robinson and Scruggs—never mind the thousands of additional supposed class members—are members of different religions, likely with different holy days.  Accordingly, the Court will have to engage in individualized analyses just to determine whether GM properly accommodated Robinson's and Scruggs' divergent unpaid-leave requests.  Moreover, Plaintiffs acknowledge that GM granted all of Robinson's leave requests until 2013, but that GM has gone back and forth on Scruggs' requests—denying them from 2008 to 2010, granting them from 2010 to 2012, and then denying them again in 2013. (Compl. at 3-7; App. to Mot at 1-10.)  These unique factors will play an important role in determining whether Robinson or Scruggs received a religious accommodation, and the Court must evaluate them individually.  Thus, even the claims of the two named Plaintiffs demonstrate that the proposed class does not present sufficiently common questions of law or fact to justify a class action.

Yet Plaintiffs wish to certify a class of thousands of employees who may request religious leave—each one with his or her own specific circumstances.  For each putative class member, the Court will have to evaluate whether GM granted or denied the requested leave in whole or in part and whether that decision was legally permissible either because GM provided an adequate accommodation or because the requested accommodation constituted an undue hardship on GM.  *EEOC v Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008). As the *Dukes* court found, "in resolving an individual's Title VII claim, the crux of the inquiry is the reason for a particular employment decision."  131 S. Ct. at 2552 (quotations omitted).  Thus, "[w]ithout some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a

common answer to the crucial question *why was I disfavored*." *Id.* (emphasis in original).  There is no such "glue" in Plaintiffs' class allegations.  Plaintiffs cannot justify class-wide discovery across all employees and GM locations based solely on subjective allegations of failure to accommodate religious-leave requests from two distinctly-situated plaintiffs in Arlington.  In such a Title VII case, "each individual's claims will necessarily depend on their own discrete factual scenarios."  *Riley v. Compucom Systems, Inc.*, No. CIV.A398CV1876L, 2000 WL 343189, at *2 (N.D. Tex. Mar. 31, 2000).  "[G]iven the unavoidable factual disparities that will necessarily impact the success or failure of each Plaintiff's claims, [Robinson and Scruggs] will not adequately represent the hundreds of diverse factual situations that are relevant to each class member's right of recovery under . . . Title VII."  *Id.* at *3.  Accordingly, Plaintiffs have failed to satisfy the commonality requirement of Rule 23(a) and the Court should deny Plaintiffs' Motion.

> **3.      Plaintiffs have failed to demonstrate that their claims are typical of the class claims because the Arlington plant's overtime plan is different from the overtime plans of all other GM plants, Plaintiffs already receive religious accommodations, and Robinson works in a unique full-time role as union committeeperson.**

In addition to failing to satisfy the numerosity and commonality requirements of Rule 23(a), Plaintiffs also fail to demonstrate that their claims and defenses "are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Because of the plant in which they work and the accommodations that they already admittedly receive, Plaintiffs' claims are not typical of the claims that putative class members will present.  Furthermore, Robinson's full-time union position makes his claims atypical.

To determine whether Plaintiffs are entitled to unpaid leave as a religious accommodation, the Court will have to analyze the impact of their requests on the plant and other workers, including whether GM will have to "force" Plaintiffs' fellow electricians to work overtime.  (*See* Kole Decl., App. 6-7.)  Because the local union in Arlington has never voted to

adopt the overtime plans described in the National Agreement, Arlington plant management and the local union have entered an understanding that governs the overtime policy at that plant. (Kole Decl., App. 4.)  The Arlington plant's overtime plan is thus unique from the overtime plans utilized at any other GM plant.   (Kole Decl., App. 4.)   Therefore, the relevant considerations for evaluating reasonable accommodations and undue hardship that apply to Plaintiffs at the Arlington plant will not apply to other class members at the hundreds of other plants incorporated into Plaintiffs' desired class.  *See Firestone*, 515 F.3d at 318.  Accordingly, Plaintiffs' claims are unique, and thus fail Rule 23(a)'s typicality requirement.

Plaintiffs also admit that they already receive a religious accommodation, which makes their claims unlike those of other potential class members.  As a religious accommodation, Plaintiffs receive every single Saturday off work—even though Saturday is a regular work day for electricians at the Arlington plant.  (Kole Decl., App. 8; App. to Mot. at 2, 8.)  To conduct an accommodation and undue-hardship analysis for each class member's claims, the Court will have to consider "the nature of the employer's efforts to accommodate [the plaintiff's] beliefs, and the plaintiff's reaction to the employer's accommodation efforts."  *Haliye*, 2009 WL 1653528, at *8.  GM's undisputed efforts to accommodate Plaintiffs' beliefs by giving them every Saturday off work differentiates Plaintiffs' claims from those of other potential class members—especially those who have not received any religious accommodations.

Finally, Robinson's current full-time position as an elected union committeeperson makes his situation atypical of the rest of the desired class.  Robinson was recently elected as a full-time union committeeperson, and thus he currently functions in that role and not as a practicing electrician.  (Kole Decl., App. 8, 92.)  As a full-time union representative, Robinson's requests for vacation or leave are evaluated differently than similar requests from functioning

electricians.  (Kole Decl., App. 8.)  When Robinson is absent, the alternate committeeperson leaves his production job and substitutes in the full-time union representative role, which requires GM to find a replacement to backfill the vacancy created on the alternate's shift.  (*Id.*) Robinson's leave requests stretch across departmental lines and require GM to consider additional variables that do not generally apply to the leave requests of other regular employees in Plaintiffs' desired class.  Accordingly, Robinson's claims are not "typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).

### D.     Plaintiffs have failed to meet the certification requirements of Rule 23(b)(1) or (b)(2).

Even if Plaintiffs had established a sufficient class under Rule 23(a)—which, as shown above, they have not—the Court should still deny Plaintiff's Motion because it fails to satisfy the requirements of Rule 23(b).  Plaintiffs rely solely on Rule 23(b)(1) and (2) to support their certification argument, but they have failed to demonstrate that either section applies. To establish a proper class under Rule 23(b)(1) or Rule 23(b)(2), Plaintiffs must allege:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
>> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>>
>> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests; [or]
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

Fed. R. Civ. P. 23(b)(1)-(2).

Without any analysis or citation to a single case, Plaintiffs summarily state that Rule 23(b)(1) requires certification because evaluating the merits of each individual religious-accommodation claim would create "an incompatible standard" whereby "General Motors treat[s] members of one religion differently than members of another religion." (Mot. at 9.) Plaintiffs misunderstand the very nature of Title VII religious-accommodation claims. "Each case involving such a determination necessarily depends upon its own facts and circumstances, and comes down to a determination of 'reasonableness' under the unique circumstances of the individual employer-employee relationship." *Redmond*, 574 F.2d at 902. Each class member's "case presents a unique combination of factors that bear on the issues of reasonable accommodation and undue hardship." *Haliye*, 2009 WL 1653528, at *8. Individual evaluations of each religious-accommodation claim on its own merits will not create incompatible standards of conduct or impair other employees' abilities to protect their own interests. To the contrary, individualized assessments of Title VII religious-accommodation claims ensure that each plaintiff's particular circumstances—"circumstances that differ substantially from plaintiff to plaintiff"—will dictate the Court's reasonableness and undue-hardship analyses, regardless of each plaintiff's particular religious affiliation. *Id.* at *10. Plaintiffs have thus failed to prove that the Court should certify their class under Rule 23(b)(1).

Likewise, Plaintiffs have not demonstrated that certification is proper under Rule 23(b)(2). Plaintiffs argue that they have established that GM's denial of unpaid religious-leave requests applies equally to the entire desired class merely because they claim to have found another Arlington employee whose leave request was denied. (Mot. at 8-9.) But Plaintiffs have failed to show that the additional employee—Janelle Fox—even fits within the proposed class definition. Plaintiffs seek to certify a class of GM employees who may seek ***unpaid*** religious

leave.  (Mot. at 1.)  In his declaration attached to the Motion, Robinson asserts that he "cannot accept pay, including vacation pay, on [his religious] holy days."  (App. to Mot. at 1.)  Similarly, Scruggs states in his declaration, "I cannot receive pay, including pay from paid time off, on these holy days."  (App. to Mot. at 7.)  While Fox's declaration states that she "cannot work on holy days" because of her religious beliefs, she never asserts that her religious beliefs prevent her from taking *paid* time off for those days.  (App. to Mot. at 11.)  Accordingly, Fox does not qualify as a member of Plaintiffs' desired class, and thus she cannot bolster Plaintiffs' certification argument.

And even if Fox did fall within Plaintiffs' class definition, Plaintiffs still have not demonstrated that nationwide certification is proper under Rule 23(b)(2).  First of all, Fox—like Plaintiffs—is an employee in the Arlington plant.  (App. to Mot. at 11.)  Thus, Plaintiffs have failed to present *any* evidence that GM's so-called "policy" of denying unpaid religious-leave requests extends beyond Arlington.   Second, the National Agreement demonstrates that certification is unwarranted.  The National Agreement gives Plaintiffs four weeks of vacation, plus the option to defer pay for those vacation days to the following January, so GM in fact *does not* require Plaintiffs to work or receive pay "on" their religious holy days as they assert.  (Kole Decl., App. 6, 38-42.)  Plaintiffs can thus take vacation on their holy days and also not "receive pay, including pay from paid time off, on these holy days."  (App. to Mot. at 7.)  Furthermore, Plaintiffs can work vacation days throughout the year and waive the holiday pay, which permits them to take an additional vacation day, which Plaintiffs could use for a holy day.  (Kole Decl., App. 5.)  And all of this is in addition to every single Saturday, which Plaintiffs and Janelle Fox already receive off as a religious accommodation.  (Kole Decl., App. 8.)  Rather than recognize this generous vacation/leave policy, Plaintiffs assert that GM has "punish[ed]" Fox for taking

religious leave.  (Mot. at 6.)  But GM disciplined Fox, not for taking a religious holy day off, but rather because she violated the National Agreement by using a "vacation restricted" day on April 6, 2015—a date that is blacked out for such vacation time under the National Agreement.  (Kole Decl., App. 6, 44-46, 61); *see Firestone*, 515 F.3d at 317 ("It is well established that Title VII does not require an employer to violate the terms of a collective bargaining agreement.").

Finally, Plaintiffs' reliance on "eighteen workers" who have provided declarations "that they would be willing to cover [Plaintiffs'] shifts" is unavailing.  (*See* Mot. at 9.)  The Fourth Circuit explained that volunteers' declared willingness to fill in for employees on religious leave is insufficient to counter an undue-hardship defense:

> Appellants retort that several of Wise's coworkers indicated they did not have a problem with covering his absences. While that may have been the case at the time, it was reasonable for Firestone to be concerned that such feelings would not be long-lived. This is because there is a significant difference between covering for an employee who is using the same amount of leave time as everyone, and covering for an employee who has been granted a special exception and allowed to take substantially more leave time than anyone. While the former could be viewed as just "part of the job," the latter may carry with it the sting of unfairness.
>
> This is no small matter. Other employees may be left wondering why they are forced to work during valuable personal or family time despite having higher seniority. Indeed, such an accommodation treats an employee with a religious obligation differently than an employee with important, but non-religious, obligations of their own, such as caring for a sick child or spouse. This could cause feelings of unequal treatment, which can cause real problems in a workforce. In addition to considering lost efficiency concerns, it was permissible for Firestone to consider the rights and perceptions of fairness of other employees when determining whether to provide such an accommodation.

*Firestone*, 515 F.3d at 318 (internal citations and quotations omitted).  Plaintiffs' reliance on Fox and available replacement workers in Arlington is insufficient to demonstrate that nationwide

certification is required under Rule 23(b)(2)—especially in light of the options available to Plaintiffs through GM's generous vacation policy.

## IV.
## CONCLUSION

To evaluate the Title VII failure-to-accommodate claims for Plaintiffs' desired class, the Court will necessarily have to engage in individualized analyses of each particular claim, including (among other things) the nature of each employee's religious beliefs, GM's attempts to accommodate those particular beliefs for each specific employee, the burden and cost of accommodation on GM, the pertinent plant, the relevant shift, the availability of volunteer replacements, the impact on fellow employees, and the resulting overtime requirements. These case-specific issues are poorly suited for a class action. Plaintiffs' Motion has failed to meet the numerosity, commonality, and typicality requirements of Rule 23(a)—much less the additional certification requirements of Rule 23(b)(1) and (b)(2). Furthermore, contrary to case law and the Federal Rules, Plaintiffs seek to certify a class of hypothetical employees who might someday request unpaid religious leave, rather than a clearly defined and ascertainable group of class plaintiffs. Therefore, GM respectfully requests the Court deny Plaintiffs' Motion and grant GM any further relief to which it is legally or equitably entitled.

Respectfully submitted,

/s/ John B. Brown
John B. Brown
Texas State Bar No. 00793412
john.brown@ogletreedeakins.com
Gavin S. Martinson
Texas State Bar No. 24060231
gavin.martinson@ogletreedeakins.com

**OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.**
8117 Preston Road, Suite 500
Dallas, Texas  75225
Telephone:  214.987.3800
Facsimile:  214.987.3987

**ATTORNEYS FOR DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served upon the following on June 26, 2015, via the Court's ECF system:

Robert J. Wiley
Eric P. Dama
Law Office of Rob Wiley, P.C.
1825 Market Center Blvd., Suite 385
Dallas, TX  75207

/s/ John B. Brown
John B. Brown

21518802.2